# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 15, 2011

No. 08-10630

Lyle W. Cayce
Clerk

RICHARD FRAME; WENDELL DECKER; SCOTT UPDIKE; J N, a minor, by his next friend and mother Gabriela Castro; MARK HAMMAN; JOEY SALAS

Plaintiffs - Appellants

v.

CITY OF ARLINGTON, A Municipal Corporation

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.[*]

BENAVIDES and PRADO, Circuit Judges:

Title II of the Americans with Disabilities Act (ADA),[1] like § 504 of the Rehabilitation Act,[2] provides that individuals with disabilities shall not "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." For nearly two decades, Title II's implementing regulations have required cities to make newly built and

---

[*] Judge Graves did not participate in this decision.

[1] 42 U.S.C. § 12132.

[2] 29 U.S.C. § 794(a).

No. 08-10630

altered sidewalks readily accessible to individuals with disabilities. The plaintiffs-appellants in this case, five individuals with disabilities, allege that defendant-appellee the City of Arlington (the City) has recently built and altered sidewalks that are not readily accessible to them. The plaintiffs brought this action for injunctive relief under Title II and § 504.

We must resolve two issues. First, we must determine whether Title II and § 504 (and their implied private right of action) extend to newly built and altered public sidewalks.[3] Second, we must determine whether that private right of action accrued at the time the City built or altered its inaccessible sidewalks, or alternatively at the time the plaintiffs first knew or should have known they were being denied the benefits of those sidewalks. We hold that the plaintiffs have a private right of action to enforce Title II and § 504 with respect to newly built and altered public sidewalks, and that the right accrued at the time the plaintiffs first knew or should have known they were being denied the benefits of those sidewalks.

## I

The plaintiffs in this case depend on motorized wheelchairs for mobility. They allege that certain inaccessible sidewalks make it dangerous, difficult, or impossible for them to travel to a variety of public and private establishments throughout the City. Most of these sidewalks allegedly were built or altered by the City after Title II became effective on January 26, 1992.[4] The plaintiffs sued

---

[3] Unless otherwise indicated, references to "sidewalks" refer to public sidewalks and parking lots.

[4] Title II was enacted on July 26, 1990 and became effective eighteen months later on January 26, 1992. Pub. L. No. 101-336 § 205(a), 104 Stat. 327, 338 (1990), (codified as amended at 42 U.S.C. §§ 12131-12165).

No. 08-10630

the City on July 22, 2005, claiming that the inaccessible sidewalks violate Title II of the ADA and § 504 of the Rehabilitation Act. The complaint was most recently amended on August 9, 2007. The plaintiffs seek injunctive relief but not damages.

The district court dismissed the plaintiffs' complaint on statute-of-limitations grounds. The district court determined that the plaintiffs' claims accrued, and the relevant two-year limitations period began to run, on the date the City finished building or altering any inaccessible sidewalk. After requiring the plaintiffs to "replead their case and allege specific dates of the City's alteration or construction efforts," the district court dismissed the complaint because it did not allege dates of construction or alteration within two years of July 22, 2005.

On appeal, a panel of this Court began by considering whether the plaintiffs had a private right of action to enforce Title II with respect to inaccessible sidewalks. The panel unanimously held that the plaintiffs had such a right because public sidewalks are "services, programs, or activities" of a public entity within the plain meaning of Title II.[5] The panel next considered whether the plaintiffs' claims were barred by Texas's two-year personal-injury statute of limitations. The panel determined that the statute of limitations is an affirmative defense on which the defendant has the burden of proof, and that the district court erred in requiring the plaintiffs to plead dates of construction in their complaint. The panel would have remanded for further proceedings. One

---

[5] *See Frame v. City of Arlington*, 575 F.3d 432, 435-37 (5th Cir. 2009) ("*Frame I*"), *withdrawn*, 616 F.3d 476 (5th Cir. 2010) ("*Frame II*"), *vacated and reh'g en banc granted*, 632 F.3d 177 (5th Cir. 2011).

member of the panel dissented, however, with respect to the panel majority's finding that the plaintiffs' claims "accrued on the date the City completed the construction or alteration of any noncompliant" sidewalk.[6] According to the dissenting judge, the plaintiffs' claims did not accrue until the plaintiffs "physically encounter[ed], or actually learn[ed] of and [were] deterred from attempting to access, a noncompliant sidewalk."[7]

Both parties petitioned for rehearing en banc. The panel majority withdrew its initial opinion and issued a revised opinion.[8] In the revised opinion, the panel majority determined that sidewalks were not "services, programs, or activities of a public entity" within the meaning of Title II. The panel majority thus held that the plaintiffs did not have a private right of action to enforce Title II with respect to sidewalks "in instances where these facilities do not prevent access to some [other] service, program, or activity."[9] The panel majority would have remanded the case "only to the extent [the plaintiffs] have alleged a noncompliant sidewalk, curb, or parking lot denies them access to a program, service, or activity that does fall within the meaning of Title II."[10] With respect to the statute of limitations, however, the panel unanimously found that the plaintiffs' claims did not accrue until the plaintiffs "knew or should have known" they were denied the benefits of the City's services, programs, or

---

[6] *Frame I*, 575 F.3d at 441.

[7] *Id.* at 445.

[8] *Frame II*, 616 F.3d at 486.

[9] *Id.* at 488.

[10] *Id.* at 490.

No. 08-10630

activities .[11]   A member of the panel again dissented, asserting that the construction, alteration, and maintenance of public sidewalks unambiguously are services, programs, or activities of a public entity within the plain meaning of Title II.[12]

We granted the plaintiffs' second petition for rehearing en banc.  At oral argument, the plaintiffs unequivocally abandoned any claims with respect to sidewalks built on or before (and not altered after) January 26, 1992. Accordingly, we deem the plaintiffs' claims with respect to such sidewalks waived and abandoned.[13]   All that remain to be considered are the plaintiffs' claims with respect to sidewalks built or altered after January 26, 1992.  We refer to such sidewalks as newly built or altered sidewalks.

## II

We review de novo a district court's dismissal of a complaint under Rule 12(b)(6).[14]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[15]   A claim for relief is plausible on its face "when the plaintiff pleads

---

[11] *Id.*

[12] *Id.*

[13] *See Jackson v .Watkins*, 619 F.3d 463, 466 n.1 (5th Cir. 2010).

[14] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795-96 (5th Cir. 2011).

[15] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

No. 08-10630

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[16]

### III

It is established that Title II of the ADA and § 504 of the Rehabilitation Act are enforceable through an implied private right of action.  The issue is whether these statutes (and their established private right of action) extend to newly built and altered public sidewalks.[17]  Based on statutory text and structure, we hold that Title II and § 504 unambiguously extend to newly built and altered public sidewalks.  We further hold that the plaintiffs have a private right of action to enforce Title II and § 504 to the extent they would require the City to make reasonable modifications to such sidewalks.

### A

#### 1

The ADA is a "broad mandate" of "comprehensive character" and "sweeping purpose" intended "to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of

---

[16] *Id.*

[17] We note that the City and its amici have repeatedly conceded (in their appellate briefing and at oral argument) that the plaintiffs *have* a private right of action to enforce Title II with respect to newly built and altered sidewalks.  The City argues that it has limited obligations with respect to sidewalks built on or before (and not altered after) January 26, 1992, but, as noted above, the plaintiffs have abandoned their claims with respect to such sidewalks.  Although our de novo review is not controlled by the City's interpretation of Title II, *see, e.g., Sanford's Estate v. Comm'r of Internal Revenue*, 308 U.S. 39, 51 (1939); *Equitable Life Assurance Soc'y of U.S. v. MacGill*, 551 F.2d 978, 983 (5th Cir. 1977), the City's concession supports our decision.

No. 08-10630

American life."[18]  Title II of the ADA focuses on disability discrimination in the provision of public services.  Specifically, Title II, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding.  Like Title II, § 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[19]  The ADA and the Rehabilitation Act generally are interpreted *in pari materia.*[20]  Indeed, Congress has instructed courts that "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act . . . or the regulations issued

---

[18] *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (citation and quotation marks omitted); *see also* 42 U.S.C. § 12101(b)(1), (2) (stating that the ADA is intended to provide a "clear and comprehensive national mandate" for eliminating disability discrimination as well as "clear, strong, consistent, enforceable standards" addressing such discrimination); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) ("The ADA stepped up earlier measures to secure opportunities for people with developmental disabilities to enjoy the befits of community living.").

[19] 29 U.S.C. § 794(a).

[20] *See, e.g.*, *Kemp v. Holder*, 610 F.3d 231, 234-35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88, 289 n.76 (5th Cir. 2005) (en banc).

No. 08-10630

by Federal agencies pursuant to such title."[21]  The parties have not pointed to any reason why Title II and § 504 should be interpreted differently in this case. Although we focus primarily on Title II, our analysis is informed by the Rehabilitation Act, and our holding applies to both statutes.

As mentioned, there is no question that Title II and § 504 are enforceable through an implied private right of action.[22]  Moreover, to the extent Title II's implementing regulations "simply apply" Title II's substantive ban on disability discrimination and do not prohibit conduct that Title II permits, they too are enforceable through Title II's private right of action.[23]  This is because when Congress intends a statute to be enforced through a private right of action, it

---

[21] 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) ("The directive requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act."); *cf.* 42 U.S.C. § 12133 (providing that "[t]he remedies, procedures, and rights" available under the Rehabilitation Act "shall be the remedies procedures, and rights" available under Title II of the ADA).

[22] *See United States v. Georgia*, 546 U.S. 151, 154 (2006) ("Title II authorizes suits by private citizens for money damages against public entities that violate [Title II]."); *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (holding that private plaintiffs could enforce Title II with respect to inaccessible courthouses); *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (stating that Title II and § 504 of the Rehabilitation Act "are enforceable through private causes of action"); *Olmstead*, 527 U.S. at 597 (holding that mentally disabled plaintiffs could sue state health officials under Title II to receive community-based treatment); *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that prisoner could sue state prison under Title II to gain admission to motivational boot camp); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 415 n.9 (5th Cir. 2004) (noting that "both Title II and § 504 are enforceable directly through private causes of action").

[23] *See Alexander v. Sandoval*, 532 U.S. 275, 285 (2001).

8

No. 08-10630

also "intends the authoritative interpretation of the statute to be so enforced as well."[24]

In interpreting the scope of Title II (and its implied private right of action), our starting point is the statute's plain meaning.[25]  In ascertaining the plain meaning of Title II, we "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."[26]

If we determine that the plain meaning of Title II is ambiguous, we do not simply impose our own construction on the statute.  When confronted with a statutory ambiguity, we refer to the responsible agency's reasonable interpretation of that statute.  Here, because Congress directed the Department of Justice (DOJ) to elucidate Title II with implementing regulations,[27] DOJ's

---

[24] *Id.* at 284-85 (citing Rehabilitation Act regulations).

[25] *See Yeskey*, 524 U.S. at 210 (analyzing the plain meaning of "benefits of the services, programs, or activities of a public entity" in determining the plaintiff's right to sue under Title II); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005) (holding that the implied private right of action to enforce Title IX of the Education Amendments of 1972 encompasses suits for retaliation "based on the statute's text"); *cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) ("[O]ur cases considering the scope of conduct prohibited by § 10(b) [of the Securities Exchange Act of 1934] in private suits have emphasized adherence to the statutory language, the starting point in every case involving construction of a statute." (citation, quotation marks, and brackets omitted)).

[26] *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

[27] *See* 42 U.S.C. § 12134(a).

No. 08-10630

views at least would "warrant respect"[28] and might be entitled to even more deference.[29]

## 2

We begin by determining whether the plain meaning of Title II extends to newly built and altered sidewalks. As noted, Title II provides that disabled individuals shall not be denied the "benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[30] The Supreme Court addressed this same statutory provision in *Pennsylvania Department of Corrections v. Yeskey*, and held that it "unambiguously" permitted a prisoner to sue a state prison.[31] The Supreme

---

[28] *Olmstead*, 527 U.S. at 598-99.

[29] *See Alexander v. Choate*, 469 U.S. 287, 305 n.24 (1985) (recognizing that "those charged with administering [the Rehabilitation Act] ha[ve] substantial leeway to explore areas in which discrimination against the handicapped posed particularly significant problems and to devise regulations to prohibit such discrimination"); *see also Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) (holding that when "Congress has explicitly left a gap for the agency to fill . . . [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute").

[30] 42 U.S.C. § 12132. There is no dispute that the plaintiffs are qualified individuals with disabilities, nor that the City is a "public entity" within the meaning of Title II. For reference, a "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). A "public entity" means, inter alia, any local government, or any department, agency, or instrumentality of a local government. *Id.* § 12131(1)(A), (B).

[31] 524 U.S. at 213.

No. 08-10630

Court considered the text of Title II as it is "ordinarily understood," and reasoned that "prisons provide inmates with recreational 'activities,' medical 'services,' and educational and vocations 'programs,' all of which at least theoretically 'benefit' the prisoners."[32]  The Supreme Court noted that "in the context of an unambiguous statutory text," it is "irrelevant" whether Congress specifically envisioned that the ADA would benefit state prisoners.[33]  That a statute may be "applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."[34]

The ADA does not define the "services, programs, or activities of a public entity."  The Rehabilitation Act, however, defines a "program or activity" as "all of the operations of . . . a local government."[35]  As already stated, we interpret Title II and the Rehabilitation Act *in pari materia.*  Accordingly, like the Supreme Court in *Yeskey*, we must determine whether newly built and altered city sidewalks are benefits of "all of the operations" and "services" of a public entity within the ordinary meaning of those terms.

Before resolving this issue, however, we briefly acknowledge two different ways of framing it.  Some parties urge us to consider whether *building* and *altering* sidewalks are services, programs, or activities of a public entity, and thus whether the resulting sidewalks are "benefits" of those services, programs, or activities.  Other parties urge us to consider whether a city sidewalk *itself* is

---

[32] *Id.* at 210.

[33] *Id.* at 212.

[34] *Id.*

[35] 29 U.S.C. § 794(b)(1)(A).

11

No. 08-10630

a service, program, or activity of a public entity. As discussed below, we believe this case does not turn on how we frame the issue.[36] Either way, when a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city unnecessarily denies disabled individuals the benefits of its services in violation of Title II.

**a**

Building and altering city sidewalks unambiguously are "services" of a public entity under any reasonable understanding of that term. The Supreme Court has broadly understood a "service" to mean "the performance of work commanded or paid for by another," or "an act done for the benefit or at the command of another."[37] Webster's Dictionary additionally defines a "service" as "the provision, organization, or apparatus for . . . meeting a general demand."[38] For its part, Black's Law Dictionary defines a "public service" as work "provided or facilitated by the government for the general public's convenience and benefit."[39]

Under each of these common understandings, building and altering public sidewalks unambiguously are services of a public entity. The construction or alteration of a city sidewalk is work commanded by another (i.e., voters and

---

[36] *See Choate*, 469 U.S. at 301 ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled . . . .").

[37] *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2721-22 (2010) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2075 (1993)).

[38] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2075 (1993).

[39] BLACK'S LAW DICTIONARY 1352 (9th ed. 2009).

public officials), paid for by another (i.e., taxpayers), and done for the benefit of another (e.g., pedestrians and drivers). When a city builds or alters a sidewalk, it promotes the general public's convenience by overcoming a collective action problem and allowing citizens to focus on other ventures. Morever, when a city builds or alters a sidewalk, it helps meet a general demand for the safe movement of people and goods.[40] In short, in common understanding, a city provides a service to its citizens when it builds or alters a public sidewalk.

A "service" also might be defined as "[t]he duties, work, or business performed or discharged by a public official."[41] Under this definition too, newly built and altered public sidewalks are services of a public entity. Cities, through their officials, study, debate, plan, and ultimately authorize sidewalk construction.[42] If a city official authorizes a public sidewalk to be built in a way that is not readily accessible to disabled individuals without adequate

---

[40] *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The state also has a strong interest . . . in promoting the free flow of traffic on public streets and sidewalks . . . ."); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 696-97 (1992) (Kennedy, J., concurring) (observing that "the principal purpose of streets and sidewalks . . . is to facilitate transportation"); *Schneider v. State of N.J., Town of Irvington*, 308 U.S. 147, 160 (1939) ("Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated.").

[41] *See supra*, n.38.

[42] *Cf. Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574-75 (5th Cir. 2002) (holding that "when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees"); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (similar); *McCarthy*, 381 F.3d at 413-14 (holding that a state official may be sued in his official capacity for prospective relief under Title II); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 289 (2d Cir. 2003) (same).

No. 08-10630

justification, the official denies disabled individuals the benefits of that sidewalk no less than if the official poured the concrete himself.

Furthermore, building and altering public sidewalks easily are among "all of the operations" (and thus also the "programs or activities") of a public entity. Webster's Dictionary broadly defines "operations" as "the whole process of planning for and operating a business or other organized unit," and defines "operation" as "a doing or performing esp[ecially] of action."[43]  In common understanding, the operations of a public entity would include the "whole process" of "planning" and "doing" that goes into building and altering public sidewalks.[44]

In sum, in common understanding, building and altering public sidewalks are services, programs, or activities of a public entity.  When a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, disabled individuals are denied the benefits of that city's services, programs, or activities.  Newly built and altered sidewalks thus fit squarely within the plain, unambiguous text of Title II.

---

[43] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (1993).

[44] For its part, Arlington publicizes that it "rebuild[s] sidewalks" through a "program" administered by the Arlington "Department of Public Works Services."  City of Arlington, *Questions and Answers - Traffic, Streets & Transportation*, http://www.arlingtontx.gov/cityhall/qna_traffic.html (last visited July 25, 2011). Although perhaps not dispositive, the City's characterization of its own programs and services is at least relevant to this case.  *Cf. Yeskey*, 524 U.S. at 210 (noting that "the statute establishing the Motivational Boot Camp at issue in this very case refers to it as a 'program'").

14

No. 08-10630

**b**

Even if we focus on a public sidewalk *itself*, we still find that a sidewalk unambiguously is a service, program, or activity of a public entity. A city sidewalk itself facilitates the public's "convenience and benefit" by affording a means of safe transportation.[45] A city sidewalk itself is the "apparatus" that meets the public's general demand for safe transportation.[46] As the Supreme Court has observed, sidewalks are "general government services"[47] "provided in common to all citizens"[48] to protect pedestrians from the "very real hazards of traffic."[49] The Supreme Court also has recognized that public sidewalks are "traditional public fora" that "time out of mind" have facilitated the general demand for public assembly and discourse.[50] When a newly built or altered city sidewalk is unnecessarily made inaccessible to individuals with disabilities, those individuals are denied the benefits of safe transportation and a venerable public forum.

---

[45] *See supra*, n.39.

[46] *See supra*, n.38.

[47] *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 17-18 (1947).

[48] *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 781-82 (1973).

[49] *Everson*, 330 U.S. at 17-18.

[50] *Boos v. Barry*, 485 U.S. 312, 318 (1988) (observing that "sidewalks" are "traditional public fora that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions'"); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757-58 (5th Cir. 2010) (recognizing same).

No. 08-10630

**3**

Were there any doubt that the plain meaning of § 12132 extends to newly built and altered sidewalks, other provisions in Title II confirm that it does. Congress directed DOJ to "promulgate regulations" that "implement" § 12132.[51] Congress also required those implementing regulations to be consistent with Rehabilitation Act coordination regulations codified at 28 C.F.R. pt. 41.[52] Notably, the Rehabilitation Act regulations that Congress sought to replicate under Title II require new and altered facilities, including sidewalks, to be accessible in most circumstances.[53] That Congress directed DOJ to "implement" § 12132 by promulgating regulations governing newly built and altered sidewalks strongly suggests that Congress thought § 12132 would extend to such sidewalks.

In fact, the ADA actually prohibits courts from construing Title II to apply a lesser standard than the Rehabilitation Act *and its implementing regulations*.[54]

---

[51] 42 U.S.C. § 12134(a); *see also* 28 C.F.R. § 35.101 (2010) ("The purpose of this part is to effectuate subtitle A of title II of the [ADA], which prohibits discrimination on the basis of disability by public entities."). DOJ's regulations were amended effective March 11, 2011. The parties do not assert that the amended regulations apply to this case, and we assume that the earlier regulations continue to apply.

[52] 42 U.S.C. § 12134(b). The coordination regulations "implement Executive Order 12250, which requires the [DOJ] to coordinate the implementation of section 504 of the Rehabilitation Act" among federal agencies. 28 C.F.R. § 41.1.

[53] 28 C.F.R. § 41.58(a) (requiring new facilities to be accessible, and altered facilities to be accessible "to the maximum extent feasible"); *id.* § 41.3(f) (defining "facility" to include "roads, walks, [and] parking lots").

[54] 42 U.S.C. § 12201(a) (requiring that "nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 . . . or the regulations issued by Federal agencies pursuant to such title").

No. 08-10630

As the Supreme Court has recognized, Congress's "directive requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act."[55] Because the Rehabilitation Act regulations require new and altered facilities, including sidewalks, to be accessible in most circumstances, our construction of § 12132 requires no less.

Additionally, in clarifying the requirements of Title II in the unique context of "designated public transportation services" (e.g., regular rail and bus services), Congress expressly provided that § 12132 requires new and altered "facilities" to be accessible.[56] Although Congress did not define "facilities," the relevant Department of Transportation (DOT) regulations define the term to include, inter alia, "roads, walks, passageways, [and] parking lots."[57] Congress's express statement that § 12132 extends to newly built and altered facilities is a good indication that Congress thought § 12132 would extend to newly built and altered sidewalks.

The City draws our attention to a purported distinction between "transportation barriers" and "services" in Title II's definition of a "qualified individual with a disability." A qualified individual with a disability is defined as:

---

[55] *Bragdon*, 524 U.S. at 632.

[56] 42 U.S.C. §§ 12146-47; *see also* H.R. REP. NO. 101-485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 366 (noting that the purpose of Part B of Title II "is to clarify the requirements of section 504 [of the Rehabilitation Act] . . . and to extend coverage to all public entities that provide public transportation, whether or not such entities receive Federal aid").

[57] 49 C.F.R. § 37.3.

17

No. 08-10630

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[58]

According to the City, because Congress included transportation barriers and services in the same sentence, Congress must have contemplated that newly built and altered sidewalks (and other facilities) are not services, programs, or activities within the meaning of § 12132.

As an initial matter, if our focus is on building and altering sidewalks, as opposed to sidewalks themselves, the City's distinction breaks down immediately. Even if the definition of a qualified individual with a disability suggests that sidewalks and services are mutually exclusive, the definition certainly does not suggest (contrary to any ordinary understanding) that building and altering sidewalks are not services.

In any event, Title II's definition of a qualified individual with a disability does not suggest that sidewalks and services are mutually exclusive. The phrase "with or without . . . the removal of architectural, communication, or transportation barriers" simply clarifies that the necessity of a reasonable accommodation does not disqualify a disabled individual from invoking Title II in the first place.[59] Drawing from the complaint in this case, a transportation barrier might be a ditch. The definition thus tells us that a newly built or

---

[58] 42 U.S.C. § 12131(2).

[59] *See Choate*, 469 U.S. at 301 (finding that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers").

altered sidewalk implicates Title II even if making that sidewalk readily accessible would require reasonably removing the ditch.  In other words, a disabled individual's right not to be denied access to a newly built or altered sidewalk does not turn on his ability to access that sidewalk in the first place. This in no way suggests that newly built and altered sidewalks are exempt from § 12132's plain, unambiguous meaning.

Taking a step back, the phrase "with or without . . . the removal of architectural, communication, or transportation barriers" in the definition of a qualified individual with a disability is used to expand Title II's nondiscrimination mandate, not narrow it.  The definition ensures that existing barriers are not used to justify future discrimination.  But recognizing that existing transportation barriers sometimes impede access to public services does not suggest that Congress thought cities could go on building new, inaccessible sidewalks.  We do not think Congress intended to limit the plain meaning of § 12132 by referring to a recognized form of disability discrimination[60] in an effort to expand § 12132's coverage.

**4**

Though unnecessary to resolve this case, legislative purpose and history confirm that Congress intended Title II to extend to newly built and altered sidewalks.   Congress anticipated that Title II would require local governments "to provide curb cuts on public streets" because the "employment, transportation, and public accommodation sections of [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to

---

[60] *See* 42 U.S.C. § 12101(a)(5) (finding that disabled individuals suffer from various forms of discrimination, including the discriminatory effects of transportation barriers).

travel on and between streets."[61]  Implicit in this declaration is a premise that sidewalks are subject to Title II in the first place.  Congress's specific application of Title II is consistent with its statutory findings.  In enacting Title II, Congress found that individuals with disabilities suffer from "various forms of discrimination," including "isolat[ion] and segregat[ion],"[62] and that inaccessible transportation is a "critical area[]" of discrimination.[63]  Moreover, Congress understood that accessible transportation is the "linchpin" that "promotes the self-reliance and self-sufficiency of people with disabilities."[64]  Continuing to build inaccessible sidewalks without adequate justification would unnecessarily entrench the types of discrimination Title II was designed to prohibit.

Title II does not only benefit individuals with disabilities.  Congress recognized that isolating disabled individuals from the social and economic mainstream imposes tremendous costs on society.  Congress specifically found

---

[61] H.R. REP. NO. 101-485(II), at 84.

[62] 42 U.S.C. § 12101(a)(2), (5); *see also Olmstead*, 527 U.S. at 600 ("Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination."); *id.* at 613-14 (Kennedy, J., concurring in part and concurring in the judgment) ("I deem it relevant and instructive that Congress in express terms identified the 'isolat[ion] and segregat[ion]' of disabled persons by society as a 'for[m] of discrimination' . . . ."); *cf. Choate*, 469 U.S. at 295 (recognizing that "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference–of benign neglect"); *id.* at 296 (recognizing that "discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus").

[63] 42 U.S.C. § 12101(a)(3); *see also* H.R. REP. NO. 101-485(II), at 37 (recognizing that inaccessible transportation is "the major barrier" to work for disabled individuals, and "[p]eople who cannot get to work . . . cannot exercise their rights and obligations as citizens").

[64] H.R. REP. NO. 101-485(II), at 37.

that disability discrimination "costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."[65] Congress also anticipated that "the mainstreaming of persons with disabilities will result in more persons with disabilities working, in increasing earnings, in less dependence on the Social Security system for financial support, in increased spending on consumer goods, and increased tax revenues."[66] The Rehabilitation Act was passed with similar findings and purpose.[67]  Continuing to build inaccessible sidewalks without adequate justification would unnecessarily aggravate the social costs Congress sought to abate.

To conclude, it would have come as no surprise to the Congress that enacted the ADA that Title II and its implementing regulations were being used to regulate newly built and altered city sidewalks.   Indeed, Title II unambiguously requires this result.   Having considered both the statutory language of § 12132 as well as the language and design of Title II as a whole, we hold that Title II unambiguously extends to newly built and altered sidewalks. Because we interpret Title II and § 504 of the Rehabilitation Act *in pari materia*, we hold that § 504 extends to such sidewalks as well.

---

[65] 42 U.S.C. § 12101(a)(8); *see also* H.R. REP. NO. 101-485(II), at 43 (recognizing that dependency "is a major and totally unnecessary contributor to public deficits and private expenditures" and costs society "literally billions of dollars annually in support payments and lost income tax revenues"); *id.* at 44 (recognizing that disability discrimination "deprives our nation of a critically needed source of labor").

[66] *Id.* at 43-44.

[67] *See, e.g.*, 29 U.S.C. § 701(b)(1) (stating that the "purposes of this chapter . . . are . . . to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through . . . the guarantee of equal opportunity").

No. 08-10630

## B

### 1

As discussed above, when a city decides to build or alter a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II. Such a sidewalk benefits persons without physical disabilities, yet that benefit is unnecessarily denied to similarly situated persons with physical disabilities. Continuing to build inaccessible sidewalks without adequate justification needlessly perpetuates the "isolation and segregation" of disabled individuals, and is the type of discrimination the ADA prohibits.[68]

That Title II extends to newly built and altered sidewalks does not mean that it, or its private right of action, requires cities to employ "any and all means" to make such sidewalks accessible.[69] A city's obligation to make newly built and altered sidewalks readily accessible is not "boundless."[70] As the Supreme Court stated in *Tennessee v. Lane*, Title II imposes an "obligation to accommodate," or a "reasonable modification requirement."[71]

---

[68] *Olmstead*, 527 U.S. at 613 (Kennedy, J., concurring in part and concurring in the judgment) (brackets omitted).

[69] *Lane*, 541 U.S. at 531.

[70] *Olmstead*, 527 U.S. at 603 (plurality).

[71] 541 U.S. at 532-33; *see also Choate*, 469 U.S. at 301 (suggesting Rehabilitation Act requires "meaningful access" and "reasonable accommodations"); *Brennan v. Stewart*, 834 F.2d 1248, 1261 (5th Cir. 1988) (recognizing same). We express no opinion as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination, a form of disparate impact discrimination, or something else entirely.

No. 08-10630

On their face, DOJ's regulations governing new and altered facilities are congruous with Title II's reasonable modification requirement. Under DOJ's regulations, each new sidewalk must be made "readily accessible" to individuals with disabilities.[72] This is because, as Congress recognized, the marginal costs of making a new sidewalk readily accessible "are often nonexistent or negligible."[73] With respect to altered sidewalks, the "altered portion" must be made "readily accessible" "to the maximum extent feasible" if it "could affect the usability of the facility."[74] Again, this is because once a public entity decides to alter a sidewalk, it generally is not a significant burden to make the altered portion of that sidewalk accessible.[75] In any event, a public entity is not "required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service."[76] Thus, DOJ's regulations do not require cities to achieve accessibility at any cost. Instead, the regulations require only that when a city chooses to construct a new sidewalk or alter an existing one, the city must take reasonable measures to ensure that those

[72] 28 C.F.R. § 35.151(a); *id.* § 35.104 (defining a "facility" to include, inter alia, "roads, walks, passageways, [and] parking lots").

[73] *See* H.R. REP. NO. 101-485(II), at 36 (recognizing that "newly constructed build-ups should be fully accessible because the additional costs for making new facilities accessible are often nonexistent or negligible").

[74] 28 C.F.R. § 35.151(b).

[75] *See* H.R. REP. NO. 101-485(II), at 36 (recognizing that "[i]f accessibility is part of the planning from the onset of a project, then that access costs no more or at the most marginally more than a project with no access").

[76] *Lane*, 541 U.S. at 532; *see also* 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(2)-(3), (b)(1), 35.151(b), (d).

sidewalks are readily accessible to individuals with disabilities. This is the same thing Title II requires.

Our conclusion is strongly suggested by the Supreme Court's decision in *Lane*. In *Lane*, the Supreme Court found that Title II requires public entities "to take reasonable measures to remove architectural and other barriers to accessibility."[77] In elucidating the scope of this "reasonable modification requirement," *Lane* reviewed DOJ's regulations with approval:

> As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards. 28 C.F.R. § 35.151 (2003). But in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures . . . .[78]

The Supreme Court's use of DOJ's regulations to illustrate the scope of Title II's reasonable modification requirement is a good indication that those regulations simply apply Title II's nondiscrimination mandate.

Similarly, in *Alexander v. Choate*, the Supreme Court recognized that "[t]he regulations implementing § 504 [of the Rehabilitation Act] are consistent with the view that reasonable adjustments in the nature of the benefit offered must at times be made to assure meaningful access."[79] As an example, the Supreme Court cited a Department of Health and Human Services regulation "requiring that new buildings be readily accessible" and "building alterations be

---

[77] 541 U.S. at 531.

[78] *Id.* at 532.

[79] 469 U.S. at 302 n.21.

accessible 'to the maximum extent feasible.'"[80]    Again, the Supreme Court's reliance on these regulations to illustrate the scope of § 504's reasonable adjustment requirement strongly suggests that those regulations (and the regulations at issue in this case) simply apply § 504's nondiscrimination mandate.

Consistent with the Supreme Court's discussion in *Lane* and *Choate* (and our own analysis), at least three other circuits have upheld a private right of action to enforce DOJ's regulations governing newly built and altered sidewalks. In *Ability Center of Greater Toledo v. City of Sandusky*, the Sixth Circuit upheld a private right of action to enforce DOJ's regulations with respect to newly built and altered sidewalks.[81]    Similarly, in *Barden v. City of Sacramento*, the Ninth Circuit permitted a private plaintiff to enforce DOJ's regulations with respect to newly built and altered (and existing) sidewalks.[82]    And in *Kinney v. Yerusalim*, the Third Circuit permitted a private plaintiff to enforce DOJ's regulations with respect to altered sidewalks.[83]    Although the Tenth Circuit's decision in *Chaffin v. Kansas State Fair Board* did not concern sidewalks, it too upheld a private right of action to enforce DOJ's regulations with respect to other facilities.[84]

---

[80] *Id.* (citing 45 C.F.R. § 84.23 (1984)).

[81] 385 F.3d 901, 906-07 (6th Cir. 2004).

[82] 292 F.3d 1073, 1076 (9th Cir. 2002).

[83] 9 F.3d at 1069.

[84] 348 F.3d 850, 861 (10th Cir. 2003).

No. 08-10630

On occasion, a plaintiff may attempt to enforce DOJ's regulations beyond what those regulations and even Title II require. In such cases, DOJ's regulations would not "simply apply" Title II's mandate, and thus would not be privately enforceable.[85] Such cases generally should be dealt with at summary judgment or trial. If the City can show that making its newly built and altered sidewalks accessible would have been unreasonable when those sidewalks were built or altered, the City would be entitled to an affirmative defense.[86] Of course, the district court also will have discretion to craft an appropriate injunction based on the particular facts of the case,[87] and thus will be able to ensure that the City's alleged violations are remedied in a reasonable manner. On the face of the plaintiffs' complaint, however, we cannot say that the plaintiffs' remaining claims are unreasonable as a matter of law.

**2**

So far, we have determined that the plain meaning of Title II extends to newly built and altered sidewalks, and that DOJ's regulations governing such

---

[85] *Sandoval*, 532 U.S. at 285.

[86] *Cf. Olmstead*, 527 U.S. at 604 (plurality) (finding that a state may "show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable," "taking into account the resources available to the State and the needs of others with mental disabilities"); *id.* at 607 (Stevens, J., concurring in part and concurring in the judgment) ("If a plaintiff requests relief that requires modification of a State's services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs.").

[87] *See, e.g.*, *United States v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994); 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY LANE, FEDERAL PRACTICE AND PROCEDURE § 2942 (2d ed.); *cf. Watson v. City of Memphis*, 373 U.S. 526, 529-31 (1963).

No. 08-10630

sidewalks will "simply apply" Title II in most cases. Unless there is some other reason to judicially limit Title II's private right of action, that private right of action would seem to authorize the plaintiffs' claims in this case.

The panel majority in *Frame II* would have limited Title II's private right of action to sidewalks that serve as "gateways" to other public services, programs, or activities.[88] As already discussed, we find no statutory basis for such a limitation.[89] The panel majority relied primarily on a DOJ regulation, 28 C.F.R. § 35.149, which provides:

> Except as otherwise provided in § 35.150 [governing the accessibility of existing facilities], no qualified individual with a disability shall, because a public entity's facilities are inaccessible . . . be denied the benefits of the services, programs, or activities of a public entity . . . .

According to the panel majority, § 35.149 suggests that sidewalks and services are mutually exclusive, and that sidewalks are subject to Title II only when they impede access to other services. The panel majority reasoned that if DOJ thought sidewalks could be a service, it would have simply regulated them like any other service and not included them in the definition of a facility.[90]

The problem with *Frame II* is that it interprets § 35.149 in isolation and ignores the rest of DOJ's regulations. Section 35.149 is but one part of DOJ's regulatory scheme. Read as a whole, DOJ's regulatory scheme makes clear that

---

[88] 616 F.3d at 488.

[89] *See Yeskey*, 524 U.S. at 210 (noting that "[t]he text of the ADA provides no basis for distinguishing" the programs, services, and activities of a public entity in one context from those provided in other contexts).

[90] *See* 28 C.F.R. § 41.3(f) (defining "facility" to include "road, walks, [and] parking lots").

sidewalks are defined as facilities not to exclude them from the scope of Title II, but simply to ensure that they are made accessible in a gradual and prioritized manner.

Had DOJ omitted sidewalks from the definition of a facility, §§ 35.130 and 35.149 would have required all sidewalks to be immediately accessible.[91]  By including sidewalks in the definition of a facility, however, DOJ was able to craft a more nuanced approach.  As already discussed, § 35.151 provides that each newly built or altered sidewalk must be readily accessible in most cases.[92]  But §§ 35.149 and 35.150 qualify that existing sidewalks (i.e., sidewalks built on or before and not altered after January 26, 1992) need not be made accessible in most cases.[93]  And to the extent an existing sidewalk impedes access to some other service, program, or activity, a city may adopt a variety of reasonable accommodations other than structural changes.[94]  DOJ's regulatory scheme thus treats newly built and altered sidewalks differently from existing sidewalks. This sensible approach does not suggest that DOJ intended to exclude newly built and altered sidewalks from the plain meaning of Title II's nondiscrimination mandate or its private right of action.[95]

---

[91] 28 C.F.R. §§ 35.130, 35.150.

[92] *Id.* § 35.151.

[93] *Id.* §§ 35.149, 35.150(a).

[94] *Id.* § 35.150(b)(1).

[95] We observe that DOJ was given authority only to "implement" § 12132.  If a "facility" could never be a "service, program, or activity" within the meaning of § 12132, then § 35.151 would go beyond what § 12132 requires in most circumstances.  It would be bizarre to conclude that DOJ interprets § 12132 in a way that calls into question the validity of its own regulations. *See Sandoval*, 532 U.S. at 282 (noting "considerable

No. 08-10630

Were there any ambiguity in DOJ's regulations (and we believe there is not), DOJ has filed an amicus brief confirming that newly built and altered sidewalks "are a subset of services, programs, or activities," and that such sidewalks need not "serve as a gateway to a service, program, or activity in order to be covered by Title II." According to DOJ, §§ 35.149-51 "simply explain how the Act applies when the service, program, or activity is a facility, or takes place in a facility." We observe that DOJ's position is consistent with its amicus briefs in similar cases.[96] Because DOJ's amicus brief corroborates our own analysis, we need not determine precisely how much deference it deserves.[97]

As a final matter, limiting Title II's private right of action to sidewalks that serve as gateways to other public services, programs, or activities would create an unworkable and arbitrary standard. Even on the panel majority's view in *Frame II*, "there should be no set proximity limitation of the sidewalk to the

---

tension" in agency regulations that go beyond their statutory mandate); *id.* at 286 n.6 (observing "how strange it is to say" that regulations may prohibit conduct that the statute permits).

[96] *See* Br. for United States as Intervenor and Amicus Curiae at 72-78, *Mason v. City of Huntsville, Ala.*, No. 10-S-2794 (N.D. Ala. June 10, 2011); Br. for United States as Amicus Curiae at 9-16, *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) (No. 01-15744), 2001 WL 34095025 at *9-16; Br. for United States as Amicus Curiae at 14, *Kinney v. Yerusalem*, 9 F.3d 1067 (3d Cir. 1993) (No. 93-1168), 1993 WL 13120087, at *14.

[97] *Compare Olmstead*, 527 U.S. at 597-98 (finding that DOJ's views as to the meaning of Title II at least "warrant respect" when DOJ has "consistently advocated" its position in other briefing), *and Auer v. Robbins*, 519 U.S. 452, 462-63 (1997) (deferring to agency's interpretation of its own regulations as presented in a legal brief), *with Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2304 n.8 (2011) (expressing "skepticism" over the "degree" to which an agency should receive deference regarding the scope of a private right of action).

29

benefit."[98]    But without a proximity limitation, the standard provides no guidance to courts or local governments about when a newly built or altered sidewalk must be accessible.  The standard thus would undermine the ADA's purpose of providing "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities,"[99] and we reject it.

## C

The City contends that the plaintiffs lack standing with respect to inaccessible sidewalks they have not personally encountered.  To be sure, Article III standing requires a plaintiff seeking injunctive relief to allege "actual or imminent" and not merely "conjectural or hypothetical" injury.[100]  Mere "some day" intentions to use a particular sidewalk, "without any description of concrete plans," does not support standing.[101]  But "imminence" is an "elastic concept" that is broad enough to accommodate challenges to at least some sidewalks that a disabled person has not personally encountered.[102]  For example, a plaintiff may seek injunctive relief with respect to a soon-to-be-built sidewalk, as long as the plaintiff shows a sufficiently high degree of likelihood that he will be denied the benefits of that sidewalk once it is built.[103]  Similarly, a disabled individual

---

[98] 616 F.3d at 484 n.9.

[99] 42 U.S.C. § 12101(b)(2).

[100] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation and quotation marks omitted).

[101] *Id.* at 564.

[102] *Id.* at 564 n.2.

[103] *See Walker v. City of Mesquite*, 169 F.3d 973, 979 (5th Cir. 1999) (finding homeowners had standing to enjoin new construction of public housing projects near

need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way.[104]   On remand, the district court will be able to apply established standing doctrine to weed out any hypothetical claims.  At this point, however, the plaintiffs have alleged in detail how specific inaccessible sidewalks negatively affect their day-to-day lives by forcing them to take longer and more dangerous routes to their destinations.  This is sufficient to support their right to sue.

## D

The City has waged a half-hearted attack on Title II's constitutionality. According to the City, "[a]n interpretation that the ADA requires construction, maintenance and retrofilling [*sic*] of all City sidewalks, curb ramps and parking lots is unconstitutional because it would exceed Congress' enforcement power under § 5 of the Fourteenth Amendment to the United States Constitution."  The City has supported its constitutional challenge with approximately three pages of briefing.

---

their neighborhoods).

[104] *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183-84 (2000) (distinguishing *Lujan* and finding standing based on plaintiffs' assertions that they would use river but for the defendant's pollution); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventative relief.  If the injury is certainly impending, that is enough."); *Disabled Ams. for Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 64 (1st Cir. 2005) (finding standing even though disabled plaintiff had not traveled aboard noncompliant ferry); *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136-37 (9th Cir. 2002) ("Once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury.").

No. 08-10630

We decline to address the City's constitutional challenge at this point. As a preliminary matter, we have not held that Title II requires the City to "construct[], maint[ain] and retrofi[t]" all of its existing sidewalks. We have held only that when a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates in violation of Title II. Because our holding is considerably narrower than the only interpretation the City asserts would be unconstitutional, it would appear that the City has no constitutional objection to our interpretation.

Additionally, DOJ has not yet had an opportunity to exercise its statutory right to intervene and defend the constitutionality of Title II.[105] DOJ's absence, together with the parties' sparse briefing, supports our decision not to address the constitutional arguments in this case. On remand, the City will have an another opportunity to present its constitutional arguments, and DOJ should have an opportunity to intervene.

## IV

There remains the issue of whether the plaintiffs' claims are barred by the statute of limitations. Neither Title II nor the Rehabilitation Act provides a limitations period. Furthermore, the default four-year limitations period for federal causes of action does not apply to this case because that period applies only to claims "arising under an Act of Congress enacted after" December 1, 1990.[106] Both Title II and the Rehabilitation Act were "enacted" before December

---

[105] 28 U.S.C. § 2403(a); *Haas v. Quest Recovery Servs., Inc.*, 549 U.S. 1163, 1163 (2007) (vacating and remanding to court of appeal "to consider the views of the United States" as to whether Title II validly abrogated state sovereign immunity).

[106] 28 U.S.C. § 1658(a).

No. 08-10630

1990,[107] and the plaintiffs have not shown that their claims were "made possible" by a post-1990 amendment to either statute.[108]

When Congress does not establish a limitations period for a federal cause of action, the "general rule" is that we borrow the most analogous period from state law.[109] We decline to adopt a state limitations period only when another federal statute "clearly provides a closer analogy," and "when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial law making."[110] Reference to federal law remains a "closely circumscribed" and "narrow" exception.[111]

No party disputes that Texas's two-year personal-injury limitations period applies to this case.[112] We have already held that Texas's personal-injury limitations period applies to Rehabilitation Act claims in another context,[113] and several of our sister circuits have applied similar limitations periods to claims

---

[107] Pub. L. No. 101-336 § 205(a) (1990).

[108] *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).

[109] *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995); *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); *see also* 28 U.S.C. § 1652.

[110] *N. Star*, 515 U.S. at 35 (quoting *Reed v. United Trans. Union*, 488 U.S. 319, 625 (1989)).

[111] *Id.*

[112] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 ("[A] person must bring suit for . . . personal injury . . . not later than two years after the day the cause of action accrues.").

[113] *See Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980, 983 (5th Cir. 1992); *cf. Holmes v. Tex. A&M Univ.*, 145 F.3d 681, 684 (5th Cir. 1998) (assuming Texas's two-year personal-injury limitations period applied to claims under Title II).

under both Title II and the Rehabilitation Act.[114]  This is because most discrimination claims involve "injury to the individual rights of a person," and thus are analogous to personal-injury tort claims.[115]  In light of this authority and the parties' failure to show or even argue that we should apply some other limitations period, we apply Texas's two-year personal-injury limitations period to this case.[116]

Although we borrow a limitations period from state law, the particular accrual date of a federal cause of action is a matter of federal law.[117]  Absent unusual circumstances not present in this case,[118] the rule is that accrual occurs

---

[114] *See, e.g.*, *Bishop v. Children's Ctr. for Dev. Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010); *Disabled in Action of Penn. v. Se. Penn. Trans. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008); *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1055 (8th Cir. 2003); *Everett v. Cobb Cnty. Sch. Bd.*, 138 F.3d 1407, 1409 (11th Cir. 1998); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996); *cf. Wilson*, 471 U.S. at 276 (finding that § 1983 claims are best characterized as personal injury actions for purposes of determining limitations period).

[115] *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661 (1987); *Wilson*, 471 U.S. at 277 ("Congress unquestionably would have considered the remedies established in the Civil Rights Act to be more analogous to tort claims for personal injury than, for example, to claims for damages to property or breach of contract.").

[116] In selecting Texas's personal-injury limitations period, we note that Texas has not adopted a general disability-discrimination law modeled on Title II or the Rehabilitation Act.  Texas does prohibit disability discrimination in employment and housing, *see* TEX. LAB. CODE ANN. § 21.051; TEX. PROP. CODE ANN. § 301.025, but the former is not analogous to Title II or the Rehabilitation Act as applied to this case, and the latter is, in any event, subject to a two-year limitations period.  *See id.* § 301.151(a).

[117] *See Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Walker v. Epps*, 550 F.3d 407, 414 (5th Cir. 2008).

[118] Although it may be "theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit," the

when a plaintiff has "a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief."[119]  In other words, accrual occurs "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured."[120]

Drawing from the text of § 12132, an injury occurs (and a complete and present cause of action arises) under Title II when a disabled individual has sufficient information to know that he has been denied the benefits of a service, program, or activity of a public entity.  As applied to this case, the plaintiffs' cause of action accrued when they knew or should have known they were being denied the benefits of the City's newly built or altered sidewalks.  This accrual date dovetails with the plaintiffs' standing to sue.  As discussed above, a disabled individual has no standing to challenge an inaccessible sidewalk until he can show "actual," "concrete plans" to use that sidewalk.[121]  Only then is the individual actually, as opposed to hypothetically, denied the benefits of the sidewalk.  But just as a plaintiff may not sue until he is actually deterred from

---

Supreme Court has admonished that we should "not infer such an odd result in the absence of any such indication in the statute."  *Reiter v. Cooper*, 507 U.S. 258, 267 (1993).  In other words, "[u]nless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief."  *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997).  We see no indication in Title II or § 504 of the Rehabilitation Act that Congress intended the plaintiffs' cause of action to accrue before they could file suit.

[119] *Wallace*, 549 U.S. at 388 (citations and quotation marks omitted); *see also Bay Area Laundry*, 522 U.S. at 201.

[120] *Epps*, 550 F.3d at 414.

[121] *Lujan*, 504 U.S. at 564.

using a newly built or altered sidewalk, so his complete and present cause of action does not accrue until that time.

Although the City recognizes that "vague and conclusory allegations related to disabled persons in general" are insufficient to support standing, the City nonetheless asserts that the plaintiffs' claims accrued as a matter of law at the time the City built or altered its inaccessible sidewalks. The key point the City fails to grasp is that a city's wrongful act and a disabled individual's injury need not coincide. A city acts wrongfully when it builds an inaccessible sidewalk without adequate justification, but a disabled individual is not injured until he is actually deterred from using that sidewalk.

An example will help illustrate the point. Plaintiff Scott Updike did not become disabled until September 8, 2003 (less than two years before his complaint was filed). Updike was not denied access to the City's inaccessible sidewalks until he became disabled. Indeed, under our precedent, Updike could not have sued to enforce Title II until he became disabled.[122] Thus, regardless of when the City built or altered its inaccessible sidewalks, Updike did not have a complete and present cause of action under Title II, and his cause of action did not accrue, until at least September 8, 2003.

Updike's claims highlight a more general problem with the City's theory of accrual. Sidewalks are durable. If a disabled individual born two years and a day after an inaccessible sidewalk is built has no right to sue, new generations will be denied the benefits of that sidewalk simply because the city evaded litigation in the past. On the City's theory, the City could knowingly construct

_____

[122] *See Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004) (stating that plaintiff must demonstrate he is a qualified individual with a disability as part of prima facie case).

No. 08-10630

an inaccessible sidewalk yet escape liability as long as no plaintiff sued for two years (and even if no plaintiff had standing to sue during those two years). We do not think Title II contemplates this result. As Congress noted when it enacted Title II: "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."[123] The City's theory of accrual would entrench and reward the types of discrimination Title II was intended to eliminate.

The City asserts that if accrual occurs only when a plaintiff is actually deterred from using a newly built or altered sidewalk, the City might be liable for "unlimited potential municipal liability." The City exaggerates. Our decision is limited to injunctive relief concerning newly built and altered sidewalks.[124] The City may avoid liability whenever it chooses simply by building sidewalks right the first time, or by fixing its original unlawful construction. In other words, the City is not liable forever; it is responsible only for correcting its own mistakes. This is not too much to ask, even when the City's mistakes have gone unchallenged for two years.

---

[123] *See* 42 U.S.C. § 12132(a)(2).

[124] This case does not present the issue of money damages, and we do not reach the issue. We have held, however, that money damages are available under Title II and § 504 only for intentional discrimination. *See Delano-Pyle*, 302 F.3d at 575; *cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998) (finding that courts have "a measure of latitude" to determine "when it is appropriate to award monetary damages" for violations of Title IX of the Education Amendments of 1972). The class of cases in which money damages will be available for inaccessible sidewalks thus would appear to be small.

37

No. 08-10630

As for the plaintiffs other than Updike, the City will have an opportunity to prove that these plaintiffs knew or should have known they were being denied the benefits of the City's newly built or altered sidewalks more than two years before they filed their claims. This is because the statute of limitations is an affirmative defense that "places the burden of proof on the party pleading it."[125] Under federal pleading requirements, which we follow,[126] a plaintiff is not required to allege that his claims were filed within the applicable statute of limitations.[127]

To be sure, a complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling.[128] A review of the plaintiffs' complaint in this case, however, shows that there are issues of material fact as to when the plaintiffs knew or should have known they were being denied the benefits of the City's newly built or altered sidewalks. The plaintiffs allege that they were denied the benefits of the City's sidewalks "[w]ithin the last two years, if not also longer." Although this allegation leaves open the possibility that some of the plaintiffs' claims may be barred by limitations, it does not plead the plaintiffs out of their case. Construing the complaint in the plaintiffs' favor, as we must on a motion to dismiss, the plaintiffs allege that they encountered the

---

[125] *F.T.C. v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 320 (5th Cir. 2004); *In re Hinsley*, 201 F.3d 638, 644-45 (5th Cir. 2000); FED. R. CIV. P. 8(c).

[126] *See TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008) (noting that "federal law governs the pleading requirements of a case in federal court").

[127] *See Simpson v. James*, 903 F.2d 372, 375 (5th Cir. 1990).

[128] *Jones v. Bock*, 549 U.S. 199, 215 (2007).

No. 08-10630

inaccessible sidewalks within two years of their complaint.  Because the statute of limitations is an affirmative defense and not a pleading requirement, it is an issue that must be resolved through discovery and summary judgment or trial.

### V

For the reasons stated , we hold that the plaintiffs have a private right of action to enforce Title II of the ADA and § 504 of the Rehabilitation Act with respect to newly built and altered sidewalks.  We further hold that the plaintiffs' private right of action accrued at the time the plaintiffs first knew or should have known they were being denied the benefits of the City's newly built and altered sidewalks.  Accordingly, we VACATE the district court's judgment and REMAND for further proceedings.

No. 08-10630

E. GRADY JOLLY, Circuit Judge, joined by JONES, Chief Judge, and SMITH, GARZA, CLEMENT, OWEN, and ELROD, Circuit Judges,  dissenting in part and concurring in part:[1]

The provision of Title II that provides a private cause of action for its enforcement reads:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Although the free-wheeling majority opinion seems to bury the narrowness of the question presented in this case,[2] the question is finally at its narrowest and most specific:[3] whether Title II of the ADA provides a private cause of action[4] to enjoin the City to modify its newly constructed or

---

[1] This dissent challenges only the majority's conclusion that a sidewalk constitutes a service under 42 U.S.C. § 12132.

[2] For example, the majority asks whether Title II applies to sidewalks.  This broad question is not the question before us, and demonstrates the majority's lack of proper focus. Title II does indeed address sidewalks: it refers to them in their capacity as transportation barriers.  Again, the appropriate question is whether Section 12132's *reference to services* includes sidewalks.

In a similar vein, the majority contends that the ADA and the Rehabilitation Act are broad statutes aimed at remedying discrimination against disabled individuals.  This point does little to aid our analysis concerning private rights of action to enforce the statute.

[3] Although the issue in this case is now narrowly drawn, the conclusion that the majority advocates leads to consequences beyond this case.

[4] A private cause of action, of course, is not the only means of enforcing Title II.  Title II and the accompanying regulations make clear that local governments bear responsibility in determining how best to make their services accessible, and that the Attorney General has enforcement powers to ensure that the city's chosen methods result in services being made accessible.  42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq.*

No. 08-10630

reconstructed sidewalks; the resolution of the question depends on whether a sidewalk is defined as a "service."[5]

The vagueness of the statute and the imprecision of the regulations allow a decision in this case to become complex and difficult. The choice presented by the court today, however, is clear: the amorphous definition of service offered by the majority or the textual definition that separates a facility from a service. The statute implicitly classifies a noncompliant sidewalk -- not as a service -- but as a transportation barrier and a facility, and the regulations specifically define a sidewalk as a facility.

If one concludes, as the majority does, that somehow a sidewalk is a "service," then one concludes that the subject matter of a private cause of action against a public entity under Title II is unlimited; if one concludes that under the ADA a sidewalk is a public "facility," and that an inanimate and static public

---

Indeed, according to its publications, the Department of Justice enforces the regulatory requirements of Title II in a variety of ways, including through formal and informal settlement agreements, mediation, and litigation. Enforcing the ADA: A Status Report from the Department of Justice, Issue 2, at 2, available at http://www.ada.gov/aprjun10.pdf (last visited May 18, 2011). In one particularly wide-ranging effort -- Project Civic Access -- DOJ enters into agreements with municipalities, counties, and other like units of local government; through this project, DOJ has investigated accessibility in all fifty states and beyond. Project Civic Access, http://www.ada.gov/civicac.htm (last visited May 18, 2011).

Title II incorporates the remedies available under § 505 of the Rehabilitation Act, which incorporates the "remedies, rights, and procedures set forth in Title VI of the Civil Rights Act of 1964 for violations of § 504 of the Rehabilitation Act." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 590 n.4 (1999). The available remedies include "termination or denial of federal funds." *Id.*

[5] The Rehabilitation Act applies only to programs and activities, but it defines these terms as "all of the operations . . . of a local government." 29 U.S.C. § 794. A sidewalk, which is an inanimate, static piece of concrete, does not constitute an "operation." Thus, we can safely conclude that a sidewalk is neither a program nor an activity.

41

No. 08-10630

facility is distinguishable from a public service, then a private cause of action is thus limited to services and does not extend to facilities.

Finally, and with no apparent discomfort, the majority finds it necessary to recast the issue that Richard Frame has stated for the en banc court. Specifically, Frame states that the sidewalks he seeks to alter constitute a service. The majority says it is not determinative whether a sidewalk is itself a service, because the labor that produced the sidewalk is a service. The majority, however, fails to recognize that the ADA provides a cause of action only if a service is denied "by reason of" disability.

In other words, the majority's alternative argument necessarily assumes that the plaintiffs were denied access to the service of the city's labor force on account of their respective disabilities. This assumption ignores that the city's labor services are not accessible to the general population as a whole; that is to say that no individual -- able bodied or disabled -- can commandeer the labor force of a city to construct or reconstruct *any* facility, sidewalk or otherwise. In short, neither facts, nor policies, nor law, supports granting the plaintiffs a right of access to the city's labor force.

For these reasons, and for the reasons that follow, I respectfully dissent.

I.

The bottom-line question presented for en banc consideration is whether private plaintiffs generally have a cause of action to require the city to reconstruct sidewalks built or repaired after January 26, 1992 (the effective date of the ADA). The question is resolved by the following analysis.

First, Title II's anti-discrimination provisions do not specifically provide that a private cause of action may be brought against a municipality to enforce ADA-compliant sidewalk construction or reconstruction. Second, although the

regulations that accompany the ADA address sidewalk construction and reconstruction, *see* 28 C.F.R. § 35.149-151,[6] regulations are not privately enforceable unless they effectuate a statutory mandate, because "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). That is, as applicable in this case, the statute does not guarantee access to facilities, but only to "services, programs, or activities."

Third, the ADA mandates equal access to governmental *services*, and it therefore provides a disabled individual with a private cause of action if he is being effectively denied meaningful access to a service. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) (stating in the context of the Rehabilitation Act that a benefit cannot be offered in a way that "effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled"). Fourth, the question of whether the plaintiffs have a private cause of action to enjoin the City to construct or reconstruct a sidewalk is resolved by determining whether a sidewalk constitutes a service. Fifth, the ADA does not define "service" in specific terms.

Sixth, turning to examine the statute and regulations for guidance, we see that the statute suggests that sidewalks constitute either a barrier to transportation, or a facility, or both. *See* 42 U.S.C. §§ 12131(2), 12146-12147. Additionally, the regulations specifically define sidewalks as a "facility." 28 C.F.R. § 35.104 ("Facility *means* all or any portion of . . . roads, walks, [and]

---

[6] We follow the majority's lead and cite to the regulations in place at the time the plaintiffs petitioned for, and were granted, rehearing en banc. *See* Majority Op. at 16 n.51.

No. 08-10630

passageways . . . .") (emphasis added).  Furthermore, the regulations draw a distinction between services and facilities at the behest of Congress:  DOJ is required to model the relevant regulations after the "regulations and analysis as in part 39 of title 28 of the Code of Federal Regulations[,]" *see* 42 U.S.C. § 12134(b), which differentiate "program[s] or activiti[es]" from "facilities."  28 C.F.R. § 39.150.

Seventh, in the light of the statute and regulations, there is no mandate for accessibility to facilities; on the other hand, there is the express mandate of the statute and the regulations to universal accessibility of services, programs, and activities.  Stated differently, facilities are specifically excluded from the access demands of the private cause of action provided in Section 12132.  Because a sidewalk is a facility -- not a service -- the sidewalk regulations are privately enforceable only if an inaccessible sidewalk effectively denies a disabled individual meaningful access to a public service.  Although the majority holds that the wheelchair-disabled have no rights of access to a sidewalk constructed or last repaired before 1992, irrespective of whether that sidewalk effectively denies a disabled person access to a city's services, this dissent would hold that if a noncompliant sidewalk effectively denies meaningful access to a service available to the general public, there is a private cause of action.

II.

This dissent now moves to consider these points more fully.  We begin by again noting that the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of" public services.  42 U.S.C. § 12132.

44

No. 08-10630

A.

Even though the statute does not explicitly define the term "services," the statute makes a few suggestions to aid our interpretation of the term.[7]  First, Title II deals with "transportation barriers," which include unfriendly sidewalks. Specifically, a "qualified individual with a disability" is defined as a disabled individual "who, *with or without* . . . the removal of *architectural*, . . . or *transportation* barriers . . . meets the essential eligibility requirements for the receipt of *services or the participation in programs or activities . . .*" 42 U.S.C. § 12131(2) (emphasis added).  Thus, we get some indication as to the meaning of services by reference to what services are *not.*  Obviously, the noncompliant sidewalks are alleged by the plaintiffs to be barriers to transportation for the wheelchair disabled.  Consequently, it is plain that transportation barriers are treated as barriers to accessing a service, and that sidewalks are not classified as a service.

We are not alone in reaching the conclusion that transportation barriers are distinguishable from services: the Supreme Court has held that the necessary implication of Section 12131(2) is that in some circumstances, local governments must "remove architectural and other barriers to [the] accessibility [of judicial services]." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).  Thus, if

---

[7] The majority relies primarily on dictionary definitions to support its argument that a sidewalk is a service.  It is therefore somewhat peculiar that the majority relies on several definitions that establish that sidewalks are *not* services.  For example, the majority notes that a service is "the *performance* of *work* commanded or paid for by another, or an *act* done for the benefit or at the command of another."  Majority Op. at 12 (internal citations and quotation marks omitted) (emphasis added).  It must be obvious to the majority that a sidewalk neither "performs work" nor "acts;" it is an inanimate object.  Similarly, the majority's argument that a sidewalk "is the 'apparatus' that meets the public's general demand for safe transportation[,]" majority op. at 15, misses the point; there, the service is transportation, not the facility of the sidewalk itself.

No. 08-10630

transportation barriers, i.e., facilities, and services are coextensive as the majority argues, the ADA requires local governments to "remove" services, i.e., transportation barriers, so that disabled individuals will have access to services. This is the nonsensical reading that follows from the majority's reasoning; we should strive to avoid such absurdity. *See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 439 (5th Cir. 2011).

In sum: although Title II of the ADA does not define services in express terms, it tells us that a service is not an inaccessible sidewalk, which is instead treated as a facility that is a *barrier* to access of a public service.

### B.

We continue to look to the statute for guidance on what a service is not, but we now turn to Part B of Title II, which deals not with public services generally, but with the specific subset of public *transportation* services. *See generally* 42 U.S.C. §§ 12141-12165. Within this part, Congress required that local governments make accessible their new and altered facilities, but only those that are "to be used in the provision of designated public transportation services . . ." 42 U.S.C. § 12146.[8] Thus, as the majority concedes, the ADA explicitly requires facilities to be made accessible in (and only in) "the *unique*

---

[8] In this context,

"designated public transportation" means transportation (other than public school transportation) by bus, rail, or any other conveyance (other than transportation by aircraft or intercity or commuter rail transportation (as defined in section 12161 of this title)) that provides the general public with general or special service (including charter service) on a regular and continuing basis.

42 U.S.C. § 12141(2).

*context* of 'designated public transportation services' . . . ." Majority Op. at 17 (emphasis added).

Given that the statute requires that facilities be accessible to disabled individuals only in this limited context, it is plain that, despite the majority's argument to the contrary, facilities are not merely a "subset of services." *See* Majority Op. at 29 ("DOJ has filed an amicus brief confirming that newly built and altered sidewalks 'are a subset of services, programs, or activities,' . . . DOJ's amicus brief corroborates our own analysis . . . ."). I reiterate: under the ADA, disabled individuals shall  not "be excluded from participation in or be denied the benefits of" public *services*. 42 U.S.C. § 12132. Thus, all services must be made accessible in all contexts. Again, the primary implication of Sections 12146 and 12147 is that facilities need only be made equally accessible *in the specific and limited context* of "designated public transit services." Thus, because facilities are not subject to the universal equal accessibility requirement, they are not -- as the majority argues -- enfolded within the term services.

Moreover, relevant precedent teaches that when Congress included the term "facilities" in Sections 12146 and 12147, it indicated that it had purposefully excluded that term from the private cause of action included in Section 12132. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original); *see also Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) ("It is a fundamental tenet of statutory construction that Congress intended to exclude language included in one section of a statute, but omitted from another section."). Thus, we should reject the majority's argument that the use of the

No. 08-10630

term facilities in Sections 12146 and 12147 demonstrates that Congress intended to include the term facilities in Section 12132.[9]

To sum up, Section 12132 provides a private cause of action when disabled individuals are denied access to public "services, programs, or activities." *See* 42 U.S.C. § 12132 (Requiring local governments to provide equal access to its "services, programs, or activities . . . ."). The use of three -- and only three -- terms indicates the statute was intended to have a structured meaning. Congress could easily have expressed its intent to prohibit local governments from denying disabled individuals equal access to *all* "facilities, services, programs, or activities." It did not. Instead, it required that local governments make their facilities accessible only in the context of transportation services.

Thus, the ADA, without explicitly defining the term services, identifies two things that a service is not: a transportation barrier and a facility. Applying those distinctions here, it seems that under the statute itself, a noncompliant sidewalk is a transportation barrier and that sidewalks in general, are -- like other static, inanimate, immobile infrastructure -- facilities.

III.

We now turn to the regulations to resolve any remaining doubt that facilities are distinguishable from services.

---

[9] The Rehabilitation Act further confirms that Congress purposely differentiated facilities and services, as that Act provides the same distinction. *See* 29 U.S.C. § 794(c) ("Small providers are not required . . . to make significant structural alterations to their existing *facilities* for the purpose of assuring *program* accessibility, if alternative means of providing the *services* are available.") (emphasis added). It is unsurprising that the Rehabilitation Act repeats the differentiation found in the ADA; as the majority points out, the two statutes are interpreted *in pari materia*. *See Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).

48

No. 08-10630

## A.

Although the majority turns to the regulations hoping to smooth off the rough incongruities of its statutory interpretation of "service" as unambiguous, the regulations, for the reasons below, actually -- and compellingly -- suggest that a sidewalk itself does not constitute a service.

First, the regulations define and designate a sidewalk as a "facility" -- not as a "service, program, or activity." 28 C.F.R. § 35.104 ("Facility *means* all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property . . . .").

Second, the regulations mirror the statute and require that all *services* shall be accessible to the disabled. 28 C.F.R. § 35.130(a) ("No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.").

Third, the regulations further provide that no disabled individual "shall, *because a public entity's facilities are inaccessible* . . . or unusable . . . be excluded from participation in, or be denied the benefits of the *services*, programs, or activities . . . ." 28 C.F.R. § 35.149 (emphasis added). Thus, under the regulations, as under the statute, all services are mandated to be accessible, but facilities, e.g., sidewalks, may remain inaccessible -- a crucial distinction that tells us, contrary to the majority's assertion, that facilities and services are two distinctly separate categories under Title II. *See* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity . . . ."); *see also* 28 C.F.R. § 35.130 ("No

49

qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."). Stated differently, under Section 35.149, a city violates the law by having inaccessible facilities *only if* those facilities deny disabled individuals access to a service.

Fourth, the regulations further provide that a city is not "[n]ecessarily require[d] . . . to make each . . . existing facilit[y] accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150.[10] Indeed, a municipality is granted the discretion to choose how best to make its services accessible; "alteration of existing facilities and construction of new facilities" is merely one potential method. 28 C.F.R. § 35.150(b)(1). Still further, *if* a city elects to provide access to its services by making "structural change[s] to facilities[,]" that city must "develop . . . a transition plan setting forth the steps necessary to complete such changes[,]" and the plan must "include a schedule for providing curb ramps . . . giving priority to walkways serving entities covered by the Act . . . ." 28 C.F.R. § 35.150(d)(1)-(2). If sidewalks are -- as the majority urges --

---

[10] "A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, *alteration of existing facilities and construction of new facilities*, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is *not* required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.150(b)(1) (emphasis added). The standard for new or altered facilities is more stringent: each facility that is built after January 26, 1992 must be made "readily accessible," and each facility that is altered after that date must be made accessible "to the maximum extent feasible." 28 C.F.R. § 35.151(a)-(b). *The question before us, of course, is whether these requirements are enforceable through a private cause of action.*

services, one would abandon good sense to say -- as the regulations would then say -- that local governments should focus their *reconstruction efforts* on services, services that "*serve* entities covered by the Act" because the sidewalks would *themselves* be "entities covered by the Act."

Finally, the regulations require only that a city make *newly constructed* or *reconstructed* sidewalks handicapped-accessible. 28 C.F.R. § 35.151. As we have said more than once, all *services* of the city must be made accessible; if the regulations characterized sidewalks a service, no sidewalk would be allowed to be inaccessible. Section 35.151 is not privately enforceable unless it effectuates a *statutory* mandate. Here, the statutory mandate, requiring accessibility for the disabled, specifically omits facilities. "[P]rivate rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. This principle means that agencies, as well en banc courts, cannot "conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Id.* at 291. Because -- as discussed at length above -- the statute mandates access to services, not facilities, Section 35.151's requirements are not enforceable in a private suit, but instead are left to other enforcement mechanisms as might be employed by the Attorney General.

In short, the *regulations expressly define sidewalks as facilities*, not as services. And, furthermore, by requiring that all services be made accessible, while requiring facilities to be made accessible only in specific and limited circumstances, the regulations are compelling that a facility -- such as a sidewalk -- is not a service.

No. 08-10630

B.

Nor is the regulatory distinction between "facilities" and "services" the result of oversight, mistake, or confusion, but derives from congressional mandate. Indeed, Congress directed that the regulations differentiate between facilities and services.

The ADA -- statutorily and specifically -- requires that the DOJ regulations regarding "'program accessibility, existing facilities,' . . . be consistent with regulations and analysis as in part 39 of title 28 of the Code of Federal Regulations." 42 U.S.C. § 12134(b). The regulations at part 39 of title 28 implementing the Rehabilitation Act draw a distinction between facilities on the one hand and programs and activities on the other. *See* 28 C.F.R. §§ 39.149-50.[11] The majority would do well to understand this point: Congress was well aware that the regulations implementing the Rehabilitation Act do not require facilities -- unlike programs and activities -- to be accessible, and it dictated that the same rule be made applicable to the ADA. *See* 42 U.S.C. § 12134(b).[12]

The statute further requires that the regulations regarding new and altered facilities track the language from the "coordination regulations under part 41 of title 28, Code of Federal Regulations . . . ." 42 U.S.C. § 12134(b). The majority correctly argues that the "regulations that Congress sought to replicate under Title II require new and altered facilities, including sidewalks, to be accessible in *most* circumstances." Majority Op. at 16 (emphasis added). The

---

[11] Services are not addressed in these regulations because the Rehabilitation Act applies only to programs or activities.

[12] As an aside, it is unsurprising that the Rehabilitation Act does not require facilities to be made accessible; as already noted, the Rehabilitation Act applies to operations, not to inanimate objects. 29 U.S.C. § 794(b).

No. 08-10630

majority's wobble, i.e., "most," proves the point. If facilities, i.e., sidewalks, are services, they must be equally accessible in *all* circumstances, not in "most circumstances." 42 U.S.C. § 12132 ("[*N*]*o qualified individual with a disability shall* . . . be excluded from participation in or be denied the benefits of the services, programs, or activities, . . . .") (emphasis added). Thus, the fact that, pursuant to Congress's direct instructions, the regulations require only that *new* -- but not all -- facilities be accessible in *most* -- but not all -- circumstances again suggests that "facility" is not a term that replicates the statutory term "service."[13] The clear mandate of the ADA is the unequivocal right of access to services, programs, and activities, and Congress required that the regulations clarify that this private right of action to demand access does not extend to facilities, a term not mentioned in § 12132.

## IV.

This dissent associates with impressive company in recognizing that the statute and regulations, when read together, provide flexibility with respect to facility repair, while requiring that *all services* be made accessible: the Supreme Court and a distinguished circuit court of appeals have recognized that the

---

[13] The majority seems to argue that the statute and regulations grant governmental entities discretion such that they need not make some services accessible. This is a misreading of the statute and the regulations as to accessibility of services, programs, and activities. As discussed above, the statute *itself* provides *no* exception to access. Moreover, although the regulations do, as the majority notes, grant a measure of relief to municipalities that are able to demonstrate that providing access in a particular milieu will result in an undue burden, the regulations further provide that the local government must, even after making this showing, "take any other action that would not result in . . . such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services . . ." 28 C.F.R. § 35.150(a)(3). In other words, the local government must make the service accessible; it may not be required to do so in the way that a private plaintiff deems most appropriate.

No. 08-10630

proper focus of the ADA is access to services, not access to facilities, and that local governments are given discretion as how best to make services accessible.

A.

First, the Supreme Court has placed particular emphasis on the flexibility granted to local governments under the regulations, saying that "a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Lane*, 541 U.S. at 532. It is worth reemphasizing the Court's language: *local governments* may decide whether, as a matter of policy, to "relocat[e] *services* to alternative, accessible sites . . . ." *See id.* (emphasis added). This insight strongly suggests that sidewalks are not services: Must the majority be told that sidewalks are not likely to be relocated to another site?

Notwithstanding *Lane*'s suggestion that sidewalks are not services, the majority insists that *Lane* supports its position that facilities are services, and thus the plaintiffs here have a private cause of action even if sidewalks are considered facilities. Majority Op. at 24 ("The Supreme Court's use of DOJ's regulations to illustrate the scope of Title II's reasonable modification [of facilities] requirement is a good indication that those regulations simply apply Title II's nondiscrimination mandate."). This "good indication" is not at all what *Lane* indicates. The services at issue in *Lane*, as the Court made clear, were "judicial services"; for our purposes, the important point is that the Court never so much as intimated that the facility -- that is, the courthouse -- was a service at issue. 541 U.S. at 531. The courthouse was merely the means of accessing the services related to legal matters offered by the government.

54

No. 08-10630

It is easy enough to apply *Lane*'s explication of the regulations to sidewalks. If a service is provided in a particular building, and that building is inaccessible to the wheelchair disabled because of noncompliant sidewalks, the governmental entity has various options. Among these: it might move the service to another facility that is supported by accessible sidewalks, or it might repair the sidewalks around the original building. The point is this: the *local government* is allowed to decide how to address the issue of inaccessibility of a service, so long as it provides *some* appropriate remedy. Thus, the Supreme Court has implicitly recognized that because it is within the city's discretion of how and when to reconstruct existing facilities and infrastructure, facilities are not services, and the statute therefore excludes this private cause of action.

B.

The First Circuit has also recognized that facilities are relevant in the ADA context only in their capacity as a gateway to a service, and that the focus of the ADA is on access to services, programs, and activities. *See Iverson v. City of Boston*, 452 F.3d 94, 99-100 (1st Cir. 2006); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6-7 (1st Cir. 2000).[14] In *Parker*, the court clarified the accessibility requirements applicable to the Monet Garden, a site located within the Botanical Gardens of the University of Puerto Rico, where the University provided the service of hosting group events. 225 F.3d at 6. The court noted the regulatory distinction between facilities and services, and said that Title II focuses on "'program accessibility' rather than 'facilities accessibility' . . . to ensure broad

---

[14]   It is certainly true, as the majority eagerly points out, that several other circuits have decided that private plaintiffs have a cause of action to enforce the ADA sidewalk regulations, but the majority -- given its failure to acknowledge what the First Circuit has said -- would apparently suggest that the viewpoint it urges is the only viewpoint among the other circuits.

55

No. 08-10630

access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access [to services] available." *Id.* The court then noted that although the government was required to "provide at least one route that a person in a wheelchair can use to" access the various ceremonies hosted at the Monet Garden, the government was *not* required to reconstruct "every passageway[.]" *Id.* at 7.

At least two other circuits have drawn a distinction between facilities and services in the context of courthouse access for disabled persons. *See Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("[Plaintiffs] allege that the wheelchair ramps and bathrooms at the courthouse impede their ability to attend trials . . . . A trial undoubtably is a service . . . within the meaning of § 12132."); *Layton v. Elder*, 143 F.3d 469, 473 (8th Cir. 1998) ("[I]f the county intends to continue using the county courthouse to provide services . . . it must make . . . the building accessible to individuals with disabilities . . . .").

Notably, these holdings fit squarely within this dissent's view of the statute and the regulations. To reiterate, we should hold that private plaintiffs have a cause of action when inaccessible sidewalks deny meaningful access to a public service.

V.

Finally, we turn to address the majority's attempt to reframe the issue presented, and to thereby shift our focus from the actual sidewalks that the plaintiffs seek to modify, to the labor services employed to construct those sidewalks. Of course, this effort reflects the majority's recognition that a static, immovable, and inanimate piece of concrete is not a service -- not only in terms of normal thinking, but as established by the statute, the regulations, and the common definitions of the term. This argument has lately been advanced to the

56

front lines of the majority's interpretative theories, notwithstanding that the plaintiffs stated the question in their en banc brief to be:

> Whether the trial court, consistent with Congress' intent, Department of Justice ("DOJ") interpretations, and numerous precedents, correctly ruled that *the sidewalks* of Arlington, Texas are a "service, program, or activity" within the meaning of Title II of the ADA.

(Emphasis added).

Thus, the majority alternatively contends that even if concrete does not constitute a service, "*building* and *altering* sidewalks are services, programs, or activities . . . ." Majority Op. at 11 (emphasis added).

This alternative argument leaves unaddressed that, under Section 12132 the denial of the construction worker's "service" must be by "reason of disability," that is, the *disability* must preclude access to the service of the labor of public employees. Furthermore, the argument falsely assumes that the public generally is provided access to commandeer the service of governmental employees. Here, for example, the non-disabled citizens have no individual right to direct the services of public construction workers to any construction project, including a sidewalk. An illustration, which is perhaps apt to our understanding, is that although the legal department of a city provides legal services in the public interest and on public matters, those public services are not available to the public at large and are not denied to the disabled by reason of their disability.

The majority vigorously contends, and we do not disagree, that Congress passed the ADA with the aim of granting disabled citizens the same access to public services that able-bodied citizens enjoy; but the majority does not contend that the ADA provides disabled individuals with *greater* access to public services. Plainly said, no citizen has access to a city's labor force for the construction of a

sidewalk.  So, surely, any denial of access to the sidewalk construction crew cannot be"by reason of . . . disability."[15]

Thus, the majority is demonstrably incorrect when it insists that it does not matter how broadly we analyze the statute.  *See* Majority Op. at 12 ("[W]e believe this case does not turn on how we frame the issue.")  The proper question is whether a sidewalk is itself a service.  The answer is that it is not.

VI.

From reading the majority opinion and this dissent, it is evident that the statute has not been drawn with preciseness.  Nevertheless, this dissent has demonstrated that the statute itself differentiates services from facilities, and has addressed sidewalks only as transportation barriers and facilities, but never as a service.  The regulations that implement the statute, however, define sidewalks as a facility.  Like the statute, these regulations never refer to sidewalks as a service.

This dissent has thus shown that the majority errs when it conflates services and facilities.  This error is further demonstrated because the statute and the regulations allow facilities to be inaccessible to the disabled in many circumstances but require all services to be made equally accessible.  Thus, a proper reading of the statute makes clear that facilities and services are treated with distinct and separate meanings.  When the statute and regulations are considered as a whole, it should be clear, except perhaps to the most intractable,

---

[15] For the same reasons, we can safely reject the majority's argument that the Rehabilitation Act provides the plaintiffs with a private cause of action to seek access to the services provided by the city's labor force.  *See* 29 U.S.C. § 794(a)("No otherwise qualified individual with a disability . . . shall, solely by *reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . .") (emphasis added).

No. 08-10630

that Congress never intended for sidewalks to constitute a service, accompanied by a private cause of action.

Finally, this dissent has shown the non-functionality of the majority's abstract argument that the labor construction services morph into the sidewalk itself.

For the reasons stated above, I respectfully dissent. I would remand to allow the district court to determine whether the plaintiffs can show that particular sidewalks deny access to services that are not otherwise accessible.